# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 22-0724

| | |
|---|---|
| EILEEN BARTON,<br><br>       Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>       Respondent. | Chief Special Master Corcoran<br><br>Filed: August 28, 2024 |

*Catherine Wallace Costigan*, Maglio Christopher & Toale, PA, Washington, DC, for Petitioner.

*Adam N. Muffett*, U.S. Department of Justice, Washington, DC, for Respondent.

### FINDINGS OF FACT[1]

On June 29, 2022, Eileen Barton filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") following an influenza vaccine she received on September 29, 2020. Petition at ¶1, 25, 28. The case was assigned to the Special Processing Unit of the Office of Special Masters.

---

[1] Because this Fact Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Fact Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

For the reasons discussed below, I find that there is preponderant evidence that Petitioner's flu vaccine was likely administered to her left arm.

## I.  Relevant Procedural History

On September 14, 2023, Respondent requested that I make a fact finding on the question of whether Petitioner received her flu vaccine in her left or right arm. ECF No. 23. On September 19, 2023, Petitioner filed a Motion for Findings of Fact ("Mot."). ECF No. 24. Respondent filed a response ("Resp.") on November 27, 2023 (ECF No. 30) and Petitioner filed a reply ("Repl.") on December 4, 2023. ECF No. 32. The issue is ripe for resolution.

## II.  Issue

At issue is whether Petitioner received the vaccination alleged as causal in her right or left arm. 42 C.F.R. § 100.3(c)(10)(iii) (pain and reduced range of motion limited to the shoulder in which the intramuscular vaccine was administered).

## III.  Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the

patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

The special master is obligated to fully consider and compare not only the medical records, testimony, but also all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational). And although later oral testimony that conflicts with medical records is less reliable as a general matter, it is appropriate for a special master to credit a petitioner's lay testimony where is does not conflict with the contemporaneous records. *Kirby*, 997 F.3d at 1382-84.

### IV.     Finding of Fact

I make the findings after a complete review of the record to include all medical records, declarations, and additional evidence and arguments filed. I find the following points to be particularly relevant:

- Petitioner received a flu vaccine in on September 29, 2020. Ex. 1 at 5; Ex. 3 at 85. The record for Petitioner's appointment with her primary care provider ("PCP"), Cecilia Vicuna-Keady, NP, on that date does not indicate

- the site of vaccination. Ex. 3 at 81-85. Subsequent records, however, indicate that the flu vaccine was administered into her right deltoid. *See e.g.*, Ex. 3 at 7, 21, 45, 51, 61, 67, 75.

- Petitioner, however, recalled receiving two injections on September 29th – her flu shot in her *left arm*, and a Vitamin B12 injection (not a vaccination) in her right arm. Ex. 23 at ¶4. She remembered pulling her sleeve up on the right side to expose her arm, but "being asked to pull her shirt sleeve down to expose [her] shoulder for the injection, rather than removing [her] entire arm from the sleeve" on the left. Ex. 13 at ¶4; Ex. 23 at ¶3. She also remembered a nurse who was "standing closer to the door" administering the B12 shot on the right and a student administering the flu shot on her left. Ex. 23 at ¶4. Upon injection, Petitioner felt "an intense pressure in her left shoulder," which she described as "pain . . . like nothing [she] had ever experienced with any prior injection." Ex. 13 at ¶4.

- Petitioner recalled that she already had another appointment scheduled in November 2020, "so [she] treated [her] shoulder with ice, heat, and Advil" until that appointment. Ex. 13 at ¶5.

- Petitioner returned to her PCP on November 9, 2020. Ex. 3 at 74. She recalled that she had "complained about [her] left shoulder pain and limited range of motion." Ex. 13 at ¶6. The record does not contain notations regarding Petitioner's complaint, but limited range of motion in the left shoulder was noted in the review of systems section of the record and confirmed in the physical exam findings. Ex. 3 at 77. Petitioner was given home exercises. *Id*. at 79. She recalls being "assured that [her] shoulder would heal on its own." Ex. 13 at ¶6.

- On November 24, 2020, Petitioner returned to her PCP for a 30-minute telehealth Medicare annual wellness visit. Ex. 3 at 69, 73. There are no references to left shoulder pain in the record of that appointment.

- Petitioner returned to her PCP on December 11, 2020, for another Vitamin B12 injection in her right deltoid. Ex. 3 at 66-68. The are no references to left shoulder pain in the record of that encounter.

- On January 14, 2021, Petitioner sent a portal message to her PCP stating that her "left arm at flu shot site has now been over 90 days in pain." Ex. 12 at 2. She stated that she "faithfully did the exercises 3x day" that were provided at her November 9, 2020 visit. *Id*. She reiterated that she was "sure

4

it's from the shot as that was beginning." *Id*. Petitioner's PCP responded advising her to apply heat for at least 30 minutes each day. *Id*.

- The following day, Petitioner saw her PCP for a previously scheduled telehealth follow-up for hypertension. Ex. 3 at 60, 62. Petitioner reported that she "continues to have left shoulder pain which started after getting her influenza vaccine months ago." *Id*. at 62. The provider suggested that Petitioner continue home exercises and heat. *Id*. at 64.

- On January 30, 2021, Petitioner sent a message to her PCP through the portal stating that "it's been 4 months since my flu shot" and asking whether it could be a SIRVA. Ex. 12 at 3. Her provider ordered a CT. *Id*.

- An ultrasound of Petitioner's left shoulder performed on February 8, 2021, revealed a small superficial lipoma. Ex. 4 at 18. When Petitioner reviewed the results, she sent a message to her PCP indicating that she believed more was wrong with her shoulder than revealed in the results. Ex. 12 at 4. She said her symptoms were not only in the spot focused on in the ultrasound. *Id*. She reiterated that her symptoms had been present since her flu shot. *Id*.

- Petitioner returned to her PCP on February 23, 2021, to follow up with respect to her left shoulder pain. Ex. 3 at 50. The HPI section of the record indicates that Petitioner had a "mass on her right arm" and that "her right arm continues to hurt." *Id*. at 52. The review of systems section notes "joint swelling and limited motion (left shoulder pain)." *Id*. at 53. On exam, the provider recorded "good ROM" for Petitioner's right shoulder and "tenderness, bursitis/tendonitis, pain on palpation, and reduced ROM" for her left shoulder. *Id*. at 54. She noted a "small, 1cm, soft mass on her left mid-humeral region." *Id*. A left shoulder x-ray was normal. *Id*. She diagnosed adhesive capsulitis of the left shoulder and administered a cortisone injection. *Id*. at 55-56.

- On February 28, 2021, Petitioner sent a message to her PCP about the Covid-19 vaccine. Ex. 12 at 5. Although the filed record does not include the complete message, Petitioner expresses concerns about the vaccination "after flu vaccine and frozen shoulder (which cortisone improved some)." *Id*. She noted that her shoulder was "much improved" after the cortisone injection. *Id*.

- Petitioner returned to her PCP on March 18, 2021. Ex. 3 at 44. She reported bruising on her right deltoid from a recent Covid-19 vaccine. *Id*. at 46. She reported 75% improvement in her left shoulder pain. *Id*. at 47. Petitioner received a Vitamin B12 injection to her left deltoid. *Id*.

- On April 22, 2021, Petitioner sent a message to her PCP about her shoulder pain. Ex. 12 at 6. She stated that she was "not sure what happened when student gave me flu shot." *Id*. She reported "7 months of pain" and that she knew 'it was from the shot." *Id*. She asked about another cortisone injection because her pain had returned. *Id*. The provider stated that she thought "it was likely a combination of the flu vaccine and a shoulder injury (frozen shoulder)." *Id*.

- Petitioner received a second cortisone injection to her left shoulder on May 19, 2021. Ex. 3 at 32.

- She returned to her PCP on June 23, 2021. Ex. 3 at 24. She reported that her left shoulder was "much better" and was only sore where she received the cortisone injection. *Id*. at 26. The provider noted that "further treatment is not needed at this time." *Id*. at 27.

- On July 20, 2021, Petitioner sent a portal message to her PCP asking whether an MRI was necessary due to residual pain in "just one spot in [her] muscle." Ex. 12 at 7. Petitioner planned to have one more cortisone injection and see an orthopedist before getting an MRI. *Id*.

- Petitioner saw an orthopedist on August 18, 2021. Ex. 5 at 7. She reported that she had received a flu injection in her left shoulder from a student on September 29, 2020, which was administered "really high," near her deltoid insertion. *Id*. At the time, she continued to have pain in the area of the flu injection and some limited motion, which had improved. *Id*. The provider believed that the flu vaccine "went into the bursa" resulting in frozen shoulder. *Id*. at 8. He advised her to take Aleve and referred her to physical therapy. *Id*.

- Petitioner began physical therapy on September 16, 2021. Ex. 2 at 4. She reported that she had a flu shot last year and "two days later" was unable to lift her arm. *Id*. On exam, she had "clear signs of impingement" in her shoulder. *Id*. at 7. Treatment was planned twice a week for ten weeks. *Id*.

- Petitioner continued to seek and receive treatment for left shoulder pain, including two MRIs, physical therapy, prescription medications, and cortisone injections. *See e.g.,* Ex. 2, Ex. 3 at 16, Ex. 4 at 20, Ex. 5 at 5.

Respondent argues that Petitioner has not provided preponderant evidence that her flu shot was administered to her left arm. Resp. at 11. In support, Respondent notes that Petitioner's "vaccination history" "plainly indicates that Petitioner received her September 29, 2020 flu vaccination in her right deltoid, not her left," and that Petitioner has not provided sufficient "independent" evidence of left-sided administration. *Id*. at 13.

However, Respondent's reading of the record evidence is unnecessarily narrow. It is undisputed that Petitioner received her flu vaccine at an appointment with her PCP on September 29, 2020, although situs is not specified in the administration records. Ex. 3 at 81-85. However, Petitioner has provided information in her declarations about the circumstances of her vaccination. *See* Ex. 13, 23. Petitioner specifically recalled receiving two injections that day, with the nurse administering a vitamin B12 shot to her right arm (nearer to the door) and a student administering a flu shot to her left arm. Ex. 23 at ¶4. She further recalled circumstances that support her situs argument. Thus, she recollects lifting the right sleeve of her shirt for the vitamin injection, but pulling down the neckline of her shirt on the left side- exposing the shoulder as well as the arm. *Id.* at ¶3. Petitioner's testimony is not contradictory to the contemporaneous medical record of September 29, 2020, but provides details consistent with the notations therein.

By Petitioner's next appointment with her PCP on November 9, 2020, a section entitled "vaccine history" appeared on the record, which indicated that the September 29, 2020 flu shot had been administered to her right deltoid. Ex. 3 at 75. But there is no evidence in the record regarding how or when that information was input into Petitioner's records. Further, only this one record, which is not itself a vaccine administration record, definitively states that Petitioner received the vaccination in her right arm. All remaining records for periods thereafter[3] are consistent in identifying the vaccinated arm as the left.

Respondent argues that Petitioner's case is similar to *Anderson v. Sec'y of Health & Human Servs.*, No. 20-195V, 2022 WL 17484352 (Fed. Cl. Spec. Mstr. Nov. 20, 2022). Relying on *Anderson,* Respondent argues that Petitioner waited "three and a half months after her vaccination, with three interim visits to her PCP, before she attributed her left-shoulder symptoms to vaccine administration." Resp. at 14-15. However, Respondent omits from his argument additional evidence regarding the site of administration in the *Anderson* case: a handwritten contemporaneous record that contradicted Petitioner's alleged site. *Anderson*, 2022 WL 17484352 at *8-9. Further, the *Anderson* petitioner did

---

[3] Although Respondent argues that this record appears "throughout [Petitioner's] medical records," it is clear that it is repeated automatically and thus, the repetition does not add legitimacy. Resp. at 11.

7

not provide "any specific recollection that would dispute the accuracy" of the contemporaneous record. *Anderson*, 2022 WL 17484352 at *8-9. But here, the record most contemporaneous with Petitioner's vaccination is silent on the site of administration. Ex. 3 at 85. And Petitioner has provided her specific recollection of the vaccination in her declaration. Ex. 23 at ¶3-4.

Also supporting Petitioner's situs contentions are the subsequent treatment records. Although the record of Petitioner's first post-vaccination visit to her PCP (occurring just over a month after her vaccination) does not mention her vaccination, it does note left shoulder pain, suggesting that Petitioner discussed her symptoms at that visit, as she alleges. Ex. 3 at 74; Ex. 13 at ¶6. And the two other intervening visits referenced by Respondent include a Medicare annual wellness visit on November 24, 2020, which is not a physical examination, and an appointment for the sole purpose of a vitamin B12 injection. Ex. 3 at 66, 69, 73; *See also* https://www.medicare.gov/coverage/yearly-wellness-visits. Due to the limited nature of both appointments, Petitioner would not necessarily have been expected to address her left shoulder pain. Thereafter, Petitioner consistently attributed her left shoulder pain to her vaccination, a fact conceded by Respondent. *See e.g.,* Ex. 3 at 62, Ex. 5 at 7, Ex. 12 at 2; Resp. at 11. In addition, there is no evidence *other* than the "vaccine history" that the vaccination was administered in Petitioner's right arm.

Admittedly, it is reasonable for Respondent to raise questions here as to whether Petitioner confused the flu vaccine she received in one arm with the vitamin injection received in the other. I cannot *definitively* determine the issue. But reviewing the record as described, and applying the "more likely than not" evidentiary standard, allows for the conclusion that Petitioner has preponderantly established that she received the relevant vaccination in her left arm, as alleged.

## V.     Scheduling Order

The following is ORDERED: **Respondent shall file, by no later than <u>Friday, September 30, 2024</u>, a status report indicating how he intends to proceed in this case in light of the record and this fact ruling.** The status report shall indicate whether he is willing to engage in discussions regarding settlement or damages or remains opposed to negotiating at this time.

IT IS SO ORDERED.

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master